UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

- - - - - - - - - - - - - - - - - - - - - - -

Robert T. Lincoln,

Plaintiff,

vs.

Sears, Roebuck and Co. d/b/a "Sears Home Improvement Products"; and Sears Home Improvement Products, Inc.,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - -

Civil File No. 02-820 (DWF/SRN )

**STIPULATION AND ORDER ALLOWING FILING OF SECOND AMENDED COMPLAINT**

**WHEREAS** Count Four of the First Amended Complaint was dismissed pursuant to the Memorandum and Order dated September 17, 2002 of the Honorable Donovan W. Frank;

**WHEREAS** the plaintiff desires to add to the complaint a claim for damages for emotional distress under Count One (the FMLA claim);

**WHEREAS** the defendants do not object to the filing of the Second Amended Complaint which is attached hereto as Exhibit A and which strikes Count Four of the First Amended Complaint and adds a demand for an award of damages for emotional distress under Count One (the FMLA claim);

**NOW THEREFORE**, the parties stipulate as follows:

1. Upon the execution of the Stipulation and Order, the plaintiff shall be allowed to file with the Court the Second Amended Complaint which is attached hereto as Exhibit A.

2. The striking of Count Four of the First Amended Complaint shall not be construed as a waiver of any kind by the plaintiff of his right to challenge that portion of Judge Frank's Memorandum and Order of September 17, 2002 dismissing said Court.

NOV 1 3 2002
FILED ______
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD ______
DEPUTY CLERK ______

3. The consent of the defendants to the addition to Count One of a claim for damages for emotional distress shall not be construed as an admission by the defendants of either (a) the plaintiff's right to seek such damages under the FMLA or (b) the plaintiff's contention that he in fact incurred such damages as a result of any violation of the FMLA by the defendants.

4. The defendants shall not be required to serve or file an Answer to the Second Amended Complaint, but shall be deemed to deny the plaintiff's entitlement to damages for emotional distress under Count One.

5. Upon execution of this Stipulation by the attorneys for the plaintiff and the defendants on behalf of their respective clients, the plaintiff shall be permitted to present this signed Stipulation to the Court *ex parte* and request that Order portion of this document be executed by the Court.

Dated: 10/23/02

James G. Ryan (No. 155962)
4421 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Tel: (612) 338-3872
Attorney for Plaintiff

Dated: 10/29/02

Kathryn A. Mrkonich-Wilson (No. 283605)
Heather C. Sherman (No. 288135)
Littler Mendelson
3110 Multifoods Tower
33 South Sixth Street
Minneapolis, MN 55402
Tel: (612) 630-1000
Attorneys for Defendants

**BY THE COURT:**

So ordered.

Dated: November 12, 2002

SUSAN RICHARD NELSON
United States Magistrate Judge

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

- - - - - - - - - - - - - - - - - - - - - - -

Robert T. Lincoln,

Plaintiff,

vs.

Sears, Roebuck and Co. d/b/a
"Sears Home Improvement Products"; and
Sears Home Improvement Products, Inc.,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - -

Civil File No. 02-840 DWF/SRN

**SECOND AMENDED COMPLAINT**
**JURY TRIAL DEMANDED**

As and for his Second Amended Complaint against the above-named defendants, the plaintiff alleges as follows:

**Preliminary Statement**

This proceeding was commenced in Hennepin County District Court for the State of Minnesota with service of the summons upon each defendant on March 22, 2002, and was removed by the defendants to the United States District Court for the District of Minnesota pursuant to a Petition for and Notice of Removal dated April 19, 2002. A First Amended Complaint was served on the defendants on or about May 24, 2002 and thereafter filed with the Court. This Second Amended Complaint is being filed pursuant to a Stipulation between the parties and an Order based on that Stipulation.



**EXHIBIT A**

## The Parties

1. The plaintiff is an adult resident of the City of Coon Rapids, County of Hennepin, State of Minnesota.

2. The defendant Sears, Roebuck and Co. ("SEARS") is a corporation organized and operating under the laws of the State of New York. At all times relevant to this proceeding, it was authorized to do business, and was in fact doing business, in the County of Hennepin, State of Minnesota.

3. In approximately February of 1999, SEARS purchased a business known as "American Home Improvement Products" and changed its name to "Sears Home Improvement Products". Since that time, SEARS has done business under that new name in the State of Minnesota and elsewhere throughout the United States, providing home-improvement services and goods to the public for a profit, including the installation and remodeling of siding, windows, kitchens, and the like.

4. The defendant Sears Home Improvement Products, Inc. is a corporation organized and operating under the laws of the State of Pennsylvania. At all times relevant to this proceeding, it was authorized to do business, and was in fact doing business, in the County of Hennepin, State of Minnesota.

## The Plaintiff's Employment

5. The plaintiff was hired by the defendants in February of 1999 to work as a service technician in St. Louis, Missouri, and the plaintiff continued to be employed full time in that and other capacities until the defendants unlawfully terminated his employment on or about July 31, 2000.

6. In July of 1999, the plaintiff was promoted by the defendants to the position of Project Coordinator, and was placed in charge of, and was transferred to, the defendants' office in Brooklyn Park, Minnesota. In that position, the plaintiff was compensated at the rate of $42,000 per year, plus quality and installation bonuses, expense reimbursements, and other benefits and items of compensation.

7. In July of 1999, at the time the plaintiff was offered the promotion and transfer from Missouri to Minnesota, and prior to accepting that offer, the plaintiff told defendants' representatives Chuck Klinzing and Larry Hoerner at a meeting in St. Louis, Missouri that he was concerned about moving from St. Louis to Minnesota because his parents lived in the St. Louis area and were not in good health. The plaintiff told them he was worried about not being able to assist them if one or both of them became ill. In response, the defendants' representatives promised the plaintiff that if he accepted the promotion and transfer to Minnesota, there would be no problem with the plaintiff being able to take time off to attend to his parents in St. Louis. The plaintiff was told that, if he needed to come back to St. Louis in such a situation, he would be allowed to come back to attend to them.

8. At that same time, July of 1999, the plaintiff's supervisor became Tim Graham, Vice President of Operations. Graham's office was in Chicago, Illinois.

9. The plaintiff performed his job well. He reduced the accounts receivable at the defendants' Brooklyn Park office from 40 accounts to three, increased the number of work crews from two to 15, and set new records for business generated by that office.

**The Plaintiff's Leave Requests**

10. In March of 2000, the plaintiff learned that his father was to undergo quadruple bypass surgery and have a lung removed in St. Louis, Missouri. The plaintiff informed Graham of this development and requested time off to visit his father. The plaintiff at that time had accumulated approximately two weeks' vacation time, as well as personal days and sick days. Graham refused to allow the plaintiff to take any time off, telling the plaintiff that the company was "too busy" for the plaintiff to leave. The plaintiff suggested to Graham that another particular project coordinator could fill in for him while the plaintiff was gone, but Graham rejected that suggestion, telling the plaintiff that everyone was "too busy". Graham told the plaintiff that there would be nothing the plaintiff could do for his father, that it was surgery, and that the plaintiff should just "suck it up".

11. After the surgery, the plaintiff's father went into a coma. On March 26, 2000, the plaintiff's mother contacted the plaintiff and requested that he come to St. Louis immediately, telling him that the doctor had said that his father might not live through the night. The plaintiff was his parents' only son.

12. The plaintiff contacted Graham in Chicago, informed him of this situation, told him that he (the plaintiff) had personal days he could use to cover any time away, and requested time off to assist his mother and visit and care for his father. Graham asked the plaintiff "Why waste the trip?" when there was "nothing" the plaintiff could do. Graham told the plaintiff that he should save his trip for the funeral. The plaintiff told Graham that he needed to make this trip. Graham asked the plaintiff how long he would be gone, and the plaintiff estimated three to five days. Graham reluctantly agreed to allow him to go, but insisted that he call Graham upon his

arrival and give Graham the telephone number at the hospital so that Graham could reach him if necessary. Graham also told the plaintiff that Graham would not have anyone fill the plaintiff's position while the plaintiff was gone, and that the plaintiff would have to manage the Minnesota office from St. Louis while the plaintiff was away.

13. The plaintiff drove all night to St. Louis and arrived at approximately 5-6 a.m. the following morning. In compliance with Graham's directive, the plaintiff contacted Graham's office and gave Graham the telephone number of the intensive-care waiting room of the hospital where his father was a patient. The plaintiff was gone a total of five work days. Toward the end of that week, he contacted Graham to inquire if he could stay longer in St. Louis. Graham told him "no" and directed him to report back to work in Minnesota the following Monday, April 3, 2000.

14. The plaintiff returned to the Brooklyn Park, Minnesota office on Monday, April 3, 2000. In the period of late April to early May, the plaintiff's father emerged from his coma and regained consciousness for a period of 2-3 weeks, and was repeatedly asking to see his son (the plaintiff). The plaintiff informed Graham of this development, told Graham he had two weeks of vacation accumulated, and requested permission to visit his father. Graham responded that vacation time could be taken only with a written request made at least three weeks in advance. The plaintiff responded that he also had at least three personal days available, and Graham responded that the company was too busy to let the plaintiff leave. The plaintiff was not allowed to leave.

15. On Tuesday, May 30, 2000, the plaintiff's father died. The plaintiff had not been allowed to visit his father, from the time of the surgery in March of 2000 onward, during any period his father was conscious.

16. At no time did Graham or any other employee or representative of the defendants inform the plaintiff of his rights under the Family Medical Leave Act ("FMLA"), or offer to provide him a leave under that Act. Had the plaintiff been accorded his rights under the FMLA, he would have been allowed to take a leave of up to 12 weeks to attend to his father during his last illness, and return to his prior or an equivalent position at the end of the leave. During such a leave, he would have been able to see and speak with his father before his death. Because he was denied his FMLA rights, the plaintiff was deprived of the opportunity of seeing or speaking to his father during any period his father could recognize or communicate with him.

17. When Graham was informed that the plaintiff's father had died, he told the plaintiff he could take only three days off for the funeral, even though the trip was 12 hours each way. The plaintiff left for St. Louis on Wednesday, May 31st. When he arrived, he learned of many family and estate matters that required his attention, and contacted Graham to request another week off of work. While he was away, the plaintiff called into the Minnesota office at least twice, retrieved reports from the office, and did his best under the circumstances to oversee the operation from St. Louis.

18. The plaintiff returned to work at the Minnesota office on Monday, June 12, 2000. Graham met with the plaintiff in person at that time at the Brooklyn Park office and told the plaintiff that Graham was going to "write [him] up" for the "condition of the office" while the plaintiff was away. On June 15, 2000, Graham did complete and give to the plaintiff a

disciplinary warning form entitled "Personnel Assistance Plan" in which Graham described the reason for the warning as follows: "Rob was absent for two weeks, during this time I managed his office. Many of the procedures we had set in place had been abandoned." At the end of that form, Graham stated as follows: "We expect marked improvement in 45 days or more serious action will have to be taken, i.e., suspension or dismissal".

19. On or about June 27, 2000, concerned about Graham's treatment of him throughout the period of his father's illness and death, the plaintiff contacted the defendants' Human Resources Department and learned for the first time that he was covered by the Family Medical Leave Act, and had been entitled to take up to 12 weeks of leave to cover the situation with his father. When the plaintiff informed Human Resources that his mother had been very depressed since his father's death and was in need of assistance, he was told by Human Resources that he could now exercise his rights under the FMLA, and that he should contact Graham and the Human Resources office for his territory, and tell them he wanted to take an FMLA leave.

20. The plaintiff contacted Graham and informed him that he had learned of his FMLA rights, that he had been advised by Human Resources that he was currently entitled to an FMLA leave, and that he wanted to take a two-week FMLA leave commencing June 30, 2000. Graham was angry, and told Lincoln that when his (Graham's) sister in law died, Graham had not taken any time off.

21. Having received no FMLA paperwork by June 29, 2000, the day before his leave was to commence, the plaintiff contacted the Human Resources Department. He received a fax transmission at the Brooklyn Park office on June 29th of FMLA paperwork under the company's

former name, "American Home Improvement Products". The plaintiff contacted Human Resources to inquire whether he should execute those documents as is or wait to receive paperwork with the correct company name on it. He was instructed by Human Resources to do the latter. The defendants never sent the plaintiff the correct FMLA paperwork, by fax or by mail.

22. While the plaintiff was on his FMLA leave beginning June 30th, he contacted the Human Resources Department on several occasions, left messages, and never received a return call. The plaintiff also contacted Graham, informed him of the situation with the missing FMLA paperwork, and Graham told him that the plaintiff need not worry about it.

23. Near the end of the two-week leave, the plaintiff contacted Graham to arrange for his return to work on Monday, July 17, 2000. Graham told the plaintiff that Graham had a replacement Production Manager handling the plaintiff's position though the end of July, and the plaintiff should not return to work for the remainder of the month (July). The plaintiff told Graham he preferred to return now as had earlier been agreed, but Graham insisted that the replacement handle the plaintiff's duties through the end of the month so that the plaintiff would be "100%" when he did return.

**The Plaintiff's Termination from Employment**

24. Unknown to the plaintiff, Graham was during the month of July (and perhaps earlier as well) making inquiries of Human Resources and others into the best way in which to bring about the termination of the plaintiff's employment.

25. On or about July 31, 2000, the plaintiff received a letter dated July 26, 2000, signed by one Charles W. Klinzing, Regional Director of Human Resources, terminating the plaintiff's employment on the grounds that the plaintiff had, in effect, abandoned his job. In that letter, Mr. Klinzing stated as follows:

> Pursuant to your request of June 27, 2000 we forwarded to your attention via facsimile to the Brooklyn Park, MN office the necessary paperwork for you to complete in order to activate your FMLA leave. These documents were received by you on or about June 29, 2000.
>
> In order for the FMLA leave to be triggered you are required to return such paperwork within 15 days of receipt thereof. Excluding the 4th of July, this paperwork was due back to the company by July 21, 2000.
>
> In as much as neither the Human Resources Department, the Brooklyn Park office, nor your immediate supervisor, Mr. Tim Graham has heard anything from you in the intervening three and one half weeks, we are left with no alternative but to conclude that you have elected to terminate your employment. Accordingly, the company considers your employment to be terminated voluntarily as of June 29, 2000.
>
> * * *
>
> We regret having to take this action, but we have afforded you every consideration possible without having even received the courtesy of a response. . .

26. As a result of his termination, the plaintiff has lost, continues to lose, and will continue to lose through the date of trial, salary, bonuses, employment benefits, and other compensation at a rate in excess of $50,000 per year.

27. The conduct of Graham and the other individual employees and agents of the defendants described or alluded to herein constituted, as a matter of law, the conduct of the defendants Sears, Roebuck and Co. and Sears Home Improvement Products, Inc.

## CLAIMS FOR RELIEF

### COUNT ONE
### VIOLATIONS OF FMLA

As and for his first claim for relief, the plaintiff realleges all foregoing allegations as if fully set forth below and further alleges as follows:

28. At all times during the period of the plaintiff's employment, the defendants were "employers" within the meaning of, and subject to the provisions of, the Family Medical Leave Act, 29 U.S.C. §2601 *et seq.* ("FMLA"). The plaintiff became an "eligible employee" under the FMLA in February of 2000, when he had been employed full time by the defendants for a period of 12 months.

29. Under the FMLA, the plaintiff was entitled, from February of 2000 onward, to a total of 12 work-weeks of leave during any 12-month period to care for his parents if either had a serious health condition, and to be reinstated to his former or an equivalent position upon his return.

30. Under the FMLA, the defendants were required to apprise the plaintiff of his rights under the FMLA by, among other things, posting in a conspicuous place on their business premises an appropriate informational notice. The defendants posted no such notice at the Brooklyn Park office.

31. The defendants denied the plaintiff his rights under the FMLA by, among other things:

a. failing to inform the plaintiff of his FMLA rights during his father's illness;

b. refusing to grant the plaintiff the leave or leaves to which he was entitled under the FMLA during his father's last illness and/or during the period following his

father's death to care for his mother;

c. retaliating against the plaintiff for attempting to exercise his FMLA rights once he learned of them in June of 2000; and

d. preventing the plaintiff from returning to his former or an equivalent position at the completion of his FMLA leave in July of 2000.

32. As a result of the defendants' violations of the FMLA, the defendants are liable to the plaintiff for the following amounts:

a. the total amount of wages, salary, employment benefits, and other compensation lost by the plaintiff;

b. interest on that amount calculated at the prevailing rate;

c. liquidated damages equal to the sum of the amounts described in clauses (a) and (b) above;

d. reinstatement of the plaintiff in his former position with an award of all seniority, fringe benefits, and other employment rights he would have received and would now enjoy had he continued to work full-time in his former position from the date of his termination through the date of trial or, in the alternative, an award of front pay sufficient to remove the effects of the statutory violation and to compensate the plaintiff fairly and fully for the damage he has suffered;

e. compensation for past and future for emotional distress and harm caused by the defendants' conduct in a currently-undetermined amount; and

f. an award of full attorney's fees, costs, and disbursements herein.

**COUNT TWO**
**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

As and for his next claim for relief against the defendants, the plaintiff realleges all foregoing allegations as if fully set forth hereunder and further alleges as follows:

33. The defendants engaged in willful, wanton, and malicious conduct and/or conduct which constituted a direct invasion of the plaintiff's rights.

34. The defendants' conduct caused the plaintiff emotional distress, for which harm the defendants are liable to the plaintiff.

**COUNT THREE**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

As and for his next claim for relief against the defendants, the plaintiff realleges all foregoing allegations as if fully set forth hereunder and further alleges as follows:

35. The conduct of the defendants in refusing to allow the plaintiff on some occasions any time at all, and on other occasions adequate time, to visit his dying father was, under the circumstances alleged herein, extreme and outrageous, and intentional and/or reckless, and said conduct caused the plaintiff extreme emotional distress, for which harm the defendants are liable to the plaintiff.

---

**COUNT FOUR, below, was dismissed by the Honorable Donovan W. Frank in his Memorandum and Order dated September 17, 2002. The plaintiff hereby strikes this Court pursuant to that dismissal by placing the Count allegations in italics, but by so doing does not waive any rights he has to challenge that aspect of Judge Frank's Order, and does not disavow or dismiss the factual allegations set forth in this Count.**

---

***COUNT FOUR***
***VIOLATION OF MINN. STAT. § 181.64 AND/OR §181.65***

*As and for his next claim for relief against the defendants, the plaintiff realleges all foregoing allegations as if fully set forth hereunder and further alleges as follows:*

*36. The defendants' representations to the plaintiff in July of 1999 that if he accepted the promotion and transfer from St. Louis to Minnesota there would be no problem with the plaintiff being able to take time off to attend to his parents in St. Louis and that, if the plaintiff needed to come back to St. Louis due to his parents' health, he would be allowed to come back to*

*attend to them, were false.*

*37. Section 181.65 of the Minnesota Statutes provides in relevant part as follows:*

> *Any person who shall be influenced, induced, or persuaded to enter or change employment or change a place of employment through or by means of any of the things prohibited in section 181.64, shall have a right of action for the recovery of all damages sustained in consequence of the false or deceptive representations, false advertising, or false pretenses used to induce the person to enter into or change a place of employment, against any person, firm, association, or corporation directly or indirectly causing such damage; and, in addition to all such actual damages such person may have sustained, shall have the right to recover such reasonable attorneys' fees as the court shall fix, to be taxed as costs in any judgment recovered.*

*38. The conduct of the defendants in July of 1999 in falsely representing to the plaintiff that, if he accepted the promotion he was being offered and moved to Minnesota, he would be allowed to attend to his parents in St. Louis if the need arose, constituted "false or deceptive representations", "false pretenses", "knowingly false representations", and/or other conduct prohibited by section 181.64 and /or 181.65 of the Minnesota Statutes.*

*39. The plaintiff was influenced, induced, or persuaded to move from Missouri to Minnesota by means of said conduct.*

*40. The defendants' conduct has caused the plaintiff the damages described herein, including lost wages and benefits, mental anguish and emotional distress, and harm to his reputation, for all of which damages the defendants are liable to the plaintiff, including the plaintiff's attorney's fees and costs.*

---

**COUNT FIVE**
**FRAUD AND/OR INTENTIONAL MISREPRESENTATION**

As and for his next claim for relief against the defendants, the plaintiff realleges all foregoing allegations as if fully set forth hereunder and further alleges as follows:

41. The defendants' representations to the plaintiff in July of 1999 that if he accepted the promotion and transfer from St. Louis to Minnesota there would be no problem with the plaintiff being able to take time off to attend to his parents in St. Louis and that, if the plaintiff needed to come back to St. Louis due to his parents' health, he would be allowed to come back to attend to them, were false.

42. In addition, the defendants' representation to the plaintiff through Graham that the plaintiff had no reason to be concerned about his non-receipt of the FMLA documents was false.

43. All of these representations:

a. concerned a past or present fact;

b. constituted a promise as to the defendants' then-present intention, even though the defendants had no such intent; and/or

c. constituted a promise which did not accurately reflect then-current facts.

44. Said representations were made by the defendants with the intent that the plaintiff rely thereon, and with knowledge of their falsity or with reckless disregard as to their truth or falsity.

45. The plaintiff did in fact rely upon those representations, and each of them, and his reliance thereon was reasonable.

46. The defendants' fraud and misrepresentation has caused the plaintiff the damages described herein, including lost wages and benefits, mental anguish and emotional distress, and harm to his reputation, for all of which damages the defendants are liable to the plaintiff.

## COUNT SIX
## NEGLIGENT MISREPRESENTATION

As and for his next claim for relief against the defendants, the plaintiff realleges all foregoing allegations as if fully set forth hereunder, and further alleges as follows:

47. The defendants' representations to the plaintiff in July of 1999 that if he accepted the promotion and transfer from St. Louis to Minnesota there would be no problem with the plaintiff being able to take time off to attend to his parents in St. Louis and that, if the plaintiff needed to come back to St. Louis due to his parents' health, he would be allowed to come back to attend to them, were false.

48. In addition, the defendants' representation to the plaintiff through Graham that the plaintiff had no reason to be concerned about his non-receipt of the FMLA documents was false.

49. The defendants owed the plaintiff a duty to exercise reasonable care or competence in obtaining and communicating said information to the plaintiff.

50. The defendants breached said duty.

51. The plaintiff relied upon said representations to his detriment, and his reliance thereon was reasonable and justified.

52. The defendants' negligent misrepresentations have caused the plaintiff the damages described herein, including lost wages and benefits, mental anguish and emotional distress, and harm to his reputation, for all of which damages the defendants are liable to the plaintiff.

**COUNT SEVEN**
**PROMISSORY ESTOPPEL**

As and for his next claim for relief against the defendants, the plaintiff realleges all foregoing allegations as if fully set forth hereunder, and further alleges as follows:

53. The defendants promised the plaintiff in July of 1999 that if he accepted the promotion and transfer from St. Louis to Minnesota there would be no problem with the plaintiff being able to take time off to attend to his parents in St. Louis and that, if the plaintiff needed to come back to St. Louis due to his parents' health, he would be allowed to come back to attend to them.

54. In addition, the defendants promised the plaintiff through Graham that nothing harmful would happen to him if he ignored his non-receipt of FMLA documents in the name of Sears Home Improvement Products.

55. In making said promises to the plaintiff, the defendants expected or should reasonably have expected that it would induce action on the part of the plaintiff in reliance upon said promises.

56. The plaintiff in fact relied upon said promises to his detriment, and said reliance was reasonable and justified.

57. As a result of the defendants' breach of said promises, the plaintiff was terminated and suffered the damages described herein.

58. Injustice can be avoided only if the defendants' promises are enforced.

**WHEREFORE,** the plaintiff demands Judgment against the defendants as follows:[1]

A. **On Count One**, for violations of the Family Medical Leave Act, an award of:

1. The total amount of wages, salary, employment benefits, and other compensation lost by the plaintiff from the date of his termination through the date Judgment is entered, which amount exceeds the sum of $50,000 per year;

2. Interest on that amount calculated at the prevailing rate;

3. Liquidated damages equal to the sum of the amounts described in the two preceding clauses;

4. Reinstatement of the plaintiff in his former position with an award of all seniority, fringe benefits, and other employment rights he would have received and would now enjoy had the plaintiff continued to work full-time in his former position from the date of his termination through the date of trial or, in the alternative, an award of front pay sufficient to remove the effects of the statutory violation and to compensate the plaintiff fairly and fully for the damage he has suffered;

5. Damages for past and future emotional distress and suffering in excess of $50,000;

6. Full attorney's fees, costs, and disbursements herein; and

7. Such legal and other relief as the Court and/or Jury deems just and equitable.

[1] Section 544.36 of the Minnesota statutes provides as follows: "In a pleading in a civil action which sets forth an unliquidated claim for relief, . . . , if a recovery of money is demanded in an amount less than $50,000, the amount shall be stated. If a recovery of money in an amount greater than $50,000 is demanded, the pleading shall state merely that recovery of reasonable damages in an amount greater than $50,000 is sought."

~~B. **On Count Four,** for violation of sections 181.64 and/or 181.65, an award as follows:~~

~~1. Damages for lost salary, wages, bonuses, and other fringe and employment benefits from the date of the plaintiff's termination through age 65 at a rate in excess of $50,000 per year, not including raises and other increases and benefits;~~

~~2. Compensatory damages for mental anguish and suffering in an amount in excess of $50,000;~~

~~3. Full attorney's fees, costs, and disbursements herein; and~~

~~4. Such legal and other relief as the Court deems just and equitable.~~

C. **On each of Counts Two, Three, Five, and Six**, for negligent infliction of emotional distress, intentional infliction of emotional distress, fraud and/or intentional misrepresentation, and negligent misrepresentation, respectively, an award as follows:

1. Damages for lost salary, wages, bonuses, and other fringe and employment benefits from the date of the plaintiff's termination through age 65 at a rate in excess of $50,000 per year, not including raises and other increases and benefits;

2. Compensatory damages for mental anguish and suffering in an amount in excess of $50,000;

3. Plaintiff's costs and disbursements herein, and pre- and post-verdict interest on the damages demanded; and

4. Such legal and other relief as the Court deems just and equitable.

D. **On Count Seven**, for promissory estoppel, an award as follows:

1. Damages for lost salary, wages, bonuses, and other fringe and employment benefits from the date of the plaintiff's termination through age 65 at a rate in excess of $50,000 per year, not including raises and other increases and benefits;

2. Plaintiff's costs and disbursements herein, and pre- and post-verdict interest on the damages demanded; and

3. Such legal and other relief as the Court deems just and equitable.

E. **Punitive Damages.** Section 549.191 of the Minnesota Statutes prohibits a plaintiff from seeking punitive damages in the initial Complaint, but requires a motion during the course of the proceeding to amend the Complaint to add such a claim. The plaintiff reserves his right to seek punitive damages, and hereby notifies the defendants of his intent to file such a motion with respect to each of Counts Two, Three, ~~Four~~, Five, and Six.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL CLAIMS TRIABLE AS OF RIGHT BY A JURY, AND AN ADVISORY JURY ON ALL OTHER CLAIMS.**

JAMES G. RYAN
Attorney for Plaintiff

Dated: ______________

______________________________

James G. Ryan
Attorney Reg. No. 155962
4421 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
(612) 338-3872