**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| **Robert T. Lincoln,** | **Civil No. 02-CV-840 (DWF/SRN)** |
| **Plaintiff,** | |
| **v.** | <u>**ORDER**</u> |
| **Sears Home Improvement Products, Inc.** | |
| **Defendant** | |

James G. Ryan, Esq., on behalf of Plaintiff

Kathryn Mrkonich Wilson, Esq., on behalf of Defendants

SUSAN RICHARD NELSON, United States Magistrate Judge

The above entitled matter came before the undersigned United States Magistrate Judge on Plaintiff's Motion to Amend the Complaint to Seek Punitive Damages. This case has been referred to the undersigned for resolution of pretrial matters pursuant to 28 U.S.C. § 636 and Local Rule 72.1.

For the reasons set forth below, Plaintiff's motion is granted and Plaintiff is permitted thirty days in which to engage in written and other discovery limited to those issues relevant to punitive damages.

## I. BACKGROUND

Plaintiff was employed by Defendant beginning in February 1999 as a service technician



SEP 0 2 2003
FILED
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

in St. Louis, Missouri. Several months later he accepted a promotion and relocation to a project coordinator position in Defendant's Brooklyn Park, Minnesota office. Plaintiff alleges that prior to accepting the promotion, Plaintiff, Plaintiff's wife, and Defendant's employees Charles Klinzing and Larry Hoerner participated in a meeting regarding the promotion and relocation. Plaintiff alleges that he voiced concerns about his ability to assist his ailing parents were he to accept the position in Minnesota. Plaintiff asserts that Klinzing and Hoerner assured him that it would be no problem for Plaintiff to take time off to help his parents if their health deteriorated. Plaintiff testified that he would not have accepted the position and moved to Minnesota without this assurance.

In March 2000, Plaintiff asked his supervisor Tim Graham for time off to be with his father who was undergoing heart bypass surgery. Plaintiff alleges that he was denied permission to go and was told that everyone was "too busy," "it's just surgery," that there was nothing Plaintiff could do for his father, and that he would have to "just suck it up." Unaware of the Family Medical Leave Act ("FMLA"), Plaintiff asserts that he suggested the use of accrued personal and vacation time, but Graham denied his request for time off.

Following his father's surgery, Plaintiff learned that his father was in a coma. Plaintiff alleges that he asked Graham for time off and was told that he was probably 'wasting his time' and should 'save the trip for the funeral.' Graham permitted Plaintiff to go for a week. Plaintiff contends that as a condition of going, he was required to conduct business while in St. Louis.

Several weeks later Plaintiff received word that his father was no longer in a coma and was asking to see Plaintiff. Plaintiff asserts that he asked for time off but Graham denied him permission to go. Plaintiff's father died on May 30, 2000 and Plaintiff was allowed eight days

off to attend the funeral. Shortly after his return to work on June 12, 2002, Plaintiff received a "write-up" regarding the condition of the office during his absence and listing areas of improvement.

On June 27, 2000 Plaintiff inquired of Defendant's Human Resources Office in the South about his ability to take time off to assist his mother, who was purportedly depressed and suicidal. Defendant's Human Resources South Office informed him of the existence of the FMLA and that he could apply for FMLA leave. Plaintiff had not heard of the FMLA from Graham, despite the fact that (a) Graham himself had taken a FMLA leave in 1998 when his own father underwent cancer surgery; and (b) another employee in the same office as Plaintiff, Timothy Divinski, had taken a FMLA leave in January 2000, just two months before Plaintiff initially requested time off.

Plaintiff next contacted Defendant's Human Resources Office in the North and spoke with Patti Retterer. Ms. Retterer told Plaintiff that she believed that he qualified for an FMLA leave, confirmed his eligibility with a superior in the Human Resources Office, and later informed him that while on a FMLA leave he was under no obligation to perform his business duties. Believing that FMLA paperwork needed to be completed immediately, Ms. Retterer put Plaintiff in touch with another Human Resources employee, Tina Lowman, so that the paperwork could be faxed to Plaintiff.

Plaintiff contacted Graham and explained that he planned to take a FMLA leave of two weeks due to his mother's situation. Plaintiff asserts that Graham became angry and told him that a member of his own family had just died and that he (Graham) was at work.

When the FMLA paperwork was faxed, Plaintiff contends that the company letterhead

was that of Defendant's predecessor company, American Home Improvement Company. Plaintiff allegedly notified the Human Resources Office of the inaccurate corporate name and was told that new paperwork would be sent and to discard the improperly-titled papers. Plaintiff contends that he was asked for an address to which the correct FMLA papers could be sent, provided his mother's address in St. Louis, and left work on June 29, 2000, in order to travel to St. Louis. When he did not receive the FMLA paperwork in St. Louis, Plaintiff contacted Graham. Graham allegedly told Plaintiff "not to worry about it [not receiving the FMLA paperwork], it will all be okay, we'll get it handled." Toward the end of his two-week leave, Plaintiff contends that he contacted Graham to arrange his return to work and was informed that he should take an additional two-weeks time off.

Defendant's Vice-President, Hoerner testified that during Plaintiff's absence, Graham told him that he had been unable to find Plaintiff, but that he might be in St. Louis with his family. Another of Defendant's employees, Chantal Devane, returned to work from a two-month leave one week after Plaintiff had started his FMLA leave. When she inquired as to Plaintiff's whereabouts, Ms. Devane testified that Graham said, "Rob's not coming back. Rob's not going to work here anymore."

During Plaintiff's leave, he returned to the office on Monday, July 17, 2000, at which time he spoke with several colleagues, talked to a customer and picked up his paycheck. He then resumed his leave. Toward the end of July 2000, Plaintiff contacted Graham to arrange his return to work. Graham included Defendant's Regional Director of Human Services Charles Klinzing in the call. Klinzing allegedly stated that Plaintiff had abandoned his job in June, no one had heard anything from him, he had made no attempt to contact anyone, he had not returned

the FMLA paperwork and that he was no longer employed. Plaintiff contends that he never received the FMLA paperwork. Plaintiff received a termination letter dated July 26, 2000. The letter stated that Plaintiff was terminated because he had failed to return the FMLA paperwork within 15 days of receipt and for his lack of contact with anyone in the office during his absence.

Discovery revealed a June 29, 2000 letter purportedly accompanying the FMLA paperwork that was addressed to Plaintiff's former address in St. Louis, rather than to his mother's address in St. Louis, or to his current home address in Minnesota. The accompanying FMLA paperwork provided for return of the requested documentation within 25 days of receipt. Plaintiff contends that even assuming that he had received the FMLA documents on June 29, 2000, the 25th work day after that day was August 4, 2000–nine days after the date of the termination letter.

Plaintiff alleges that Defendant caused negligent infliction of emotional distress by engaging in willful, wanton, and malicious conduct and/or conduct which constituted a direct invasion of Plaintiff's rights. Plaintiff also asserts a claim for intentional infliction of emotional distress, alleging that with respect to Plaintiff's requests for time off to visit his dying father, Defendant's conduct was extreme and outrageous and intentional and/or reckless. Further, Plaintiff asserts claims for fraud and/or intentional misrepresentation, negligent misrepresentation and promissory estoppel based on two alleged representations made to Plaintiff: (1) that if he accepted the relocation to Minnesota that he would be able to visit his ailing parents in St. Louis; and (2) that Plaintiff had no reason to be concerned about the non-receipt of the FMLA documents.

The parties have conducted discovery and Plaintiff now moves this Court to amend the

complaint and add a claim for punitive damages and to engage in discovery relating to those damages.

## II. PARTIES' POSITIONS

Plaintiff argues that he has satisfied the pleading requirements to add a claim for punitive damages under Minn. Stat. § 549.191. Specifically, Plaintiff contends that he has established clear and convincing evidence that the acts of the Defendant show deliberate disregard for the rights or safety of others under Minn. Stat. § 549.20.

Defendant argues that Plaintiff's underlying common law claims for which he seeks punitive damages are preempted by the Minnesota Workers' Compensation Act ("WCA"), therefore, Plaintiff cannot pursue punitive damages based upon them. In response, Plaintiff argues that under Minnesota law, mental injuries caused by work-related mental stress are outside the purview of the WCA. Defendant alternately argues that Plaintiff fails to meet the burden of establishing clear and convincing evidence of "deliberate disregard" -- the legal standard necessary for a punitive damages amendment. Further, Defendant argues that Plaintiff fails to establish the prima facie elements of the underlying common law claims on which his punitive damages claims are based. Plaintiff responds that in this motion to seek punitive damages the focus is on whether he has produced clear and convincing evidence of deliberate disregard.

## III. DISCUSSION

### A. <u>Applicability of Minnesota's Workers' Compensation Act</u>

The Minnesota Worker's Compensation Act applies to cases alleging "personal injury or death of an employee arising out of and in the course of employment." Minn. Stat. § 176.021,

subd. 1. Where an injury does not fall within the WCA, the common law remedy is not affected by it. Rosenfield v. Matthews, 201 Minn. 113, 115-16; 275 N.W. 698 (1937) (citations omitted) ("The statute is a substitute for the common law on the subject which it covers and so far as it goes. But it does not affect rights and wrongs not within its purview or which by implication or express negation are excluded."); Klaahsen v. APCOA/Standard Parking, Inc., No. Civ. 02-620 (RHK/AJB), 2002 WL 1397041, at *5 (D. Minn. Jun. 26, 2002) (stating, "If an injury is not compensable as a 'personal injury' under the WCA, however, the exclusivity provision of the act does not apply and the employee can assert common-law claims to recover her damages.").

As to workers' compensation cases alleging mental injury, Minnesota courts have classified these cases into three groups: (1) cases in which mental trauma results in physical injury; (2) cases in which physical trauma results in mental injury; and (3) cases in which mental trauma results in mental injury. Johnson v. Paul's Auto & Truck Sales, Inc., 409 N.W.2d 506, 508 (Minn. 1987); Egeland v. City of Minneapolis, 344 N.W.2d 597, 604 (Minn. 1984). Although the first two categories are compensable under the WCA, Minnesota denies coverage under the WCA to the third category–i.e., where mental stimulus produces mental injury. Castner v. MCI Telecommunications Corp., 415 N.W.2d 873 (Minn. 1987) (holding that under the WCA, "mental injuries caused by or aggravated by work-related physical injuries are compensable, whereas mental injuries produced by work-related stress are not."); Lockwood v. Indep. School Dist. No. 287, 312 N.W.2d 924 (Minn. 1981).

### 1. Whether the WCA Preempts Plaintiff's Common Law Claims

While the WCA applies to work-related personal injuries, Minnesota courts have interpreted the statute to exclude its application to mental injuries caused by work-related mental trauma. Id. Plaintiff has alleged emotional injuries stemming from work-related mental trauma. Accordingly, this Court finds that the WCA does not preempt Plaintiff's common law claims.

The unpublished decisions which Defendant cites as persuasive authority involve physical trauma or at least physical contact resulting in mental and/or physical injury and are therefore factually distinguishable from this case, which alleges mental trauma and mental injury. (Def's Mem. in Opp. to Punitive Dams. Mot. at 5-6, citing Klaahsen, 2002 WL 1397041; Xiong v. Golden Valley Microwave Foods., Inc., No. C4-97-1631, 1998 WL 27296 (Minn. App. Jan. 27, 1998); Wise v. Digital Equipment Corp., No. C9-94-461, 1994 WL 664973 (Minn. App. Nov. 29, 1994)).

### B. Requirements to Assert a Claim for Punitive Damages

"In the Federal Courts of this District, the pleading of a punitive damage claim, under causes of action premised upon the Laws of the State of Minnesota, must generally conform to the requisites of Minnesota Statutes Sections 549.191 and 549.20." Ulrich v. City of Crosby, 848 F. Supp. 861, 866 (D. Minn. 1994); Zeelan Industries, Inc. v. de Zeeuw, 706 F. Supp. 702, 705 (D. Minn. 1989); Kuehn v. Shelcore, Inc., 686 F. Supp. 233, 235 (D. Minn. 1988); Fournier v. Marigold Foods, Inc., 678 F. Supp. 1420, 1422 (D. Minn. 1988).

"As recognized by our Court, the Minnesota Legislature adopted, in 1986, the pleading requirements of Section 549.191 in order to deter certain practices in the presentment of punitive

damage claims which were thought to be abusive, and in order to deter a perceived insurance crisis." Ulrich, 848 F. Supp. at 866-67. In all instances in which Minn. Stat. § 549.191 applies, a plaintiff may not assert a punitive damage claim in the complaint in the first instance, but rather must seek leave of court to amend the pleading pursuant to that section.

Under § 549.20,[1] a plaintiff can establish a prima facie showing of entitlement to plead punitive damages by demonstrating through clear and convincing evidence that the defendant deliberately disregarded the rights or safety of others.[2] "The term 'prima facie' does not refer to a quantum of evidence, but to a procedure for screening out unmeritorious claims for punitive damages." Swanlund v. Shimano Indus. Corp., 459 N.W.2d 151, 154 (Minn. App. 1990). A court does not make credibility findings and does not consider evidence offered in opposition. E.g., id. Rather, the court examines the plaintiff's evidence and determines if such evidence left unrebutted would reasonably allow a conclusion that clear and convincing evidence will establish that the defendant deliberately disregarded the rights or safety of others. E.g., id.

---

[1] Minn. Stat. § 549.20 Subdivision 1 reads:
(a) Punitive damages shall be allowed in civil actions only upon clear and convincing evidence that the acts of the defendant show deliberate disregard for the rights or safety of others.
(b) A defendant as acted with deliberate disregard for the rights or safety of others if the defendant has knowledge of facts or intentionally disregards facts that create a high probability of injury to the rights or safety of others and:
(1) deliberately proceeds to act in conscious or intentional disregard of the high degree of probability of injury to the rights or safety of others; or
(2) deliberately proceeds to act with indifference to the high probability of injury to the rights or safety of others.

[2] Clear and convincing evidence is that which is more than a preponderance but less than proof beyond a reasonable doubt. Olson v. Snap Prod., Inc., 29 F.Supp.2d 1027, 1036 (D. Minn 1998).

### 1. Whether Plaintiff Has Met the Requirements of Minn. Stat. § 549.191 and § 549.20

The Court finds that Plaintiff has complied with the pleading requirements of Minn. Stat. § 549.191. He has correctly sought leave of Court to amend the complaint and add a punitive damages claim, rather than alleging it in the first instance.

In analyzing Plaintiff's claim under Minn. Stat. § 549.20, this Court reminds the parties that the Court does not make any credibility determinations and does not review evidence in opposition to Plaintiff's allegations. E.g., Swanlund v. Shimano Indus. Corp., 459 N.W.2d 151, 154 (Minn. App. 1990). The Court acknowledges, however, that the standard for the amendment of punitive damages is a heightened standard requiring a showing of clear and convincing evidence. Defendant argues that Plaintiff fails to satisfy the underlying elements of his common law claims. The motion before us, however, is not a motion to dismiss those claims. Accordingly, the Court is not engaging in that analysis or reaching any ultimate legal conclusions regarding plaintiff's common law claims. Rather, the Court finds that Plaintiff has properly pled claims sufficient for the Court to consider this punitive damages motion. The Court disagrees with Defendant's argument that Plaintiff has failed to identify any "extraordinary circumstances" supporting the rationale for adding a punitive damages claim.

While Plaintiff has provided evidence of several work-related incidents in support of his required showing of deliberate disregard, the Court finds most persuasive Plaintiff's evidence regarding the assurances made to Plaintiff concerning the non-receipt of the FMLA paperwork. Plaintiff has presented evidence that, when apprised for the first time of the existence of the FMLA, he sought to obtain the necessary FMLA paperwork and complete it. (Lincoln. Dep. at

142-154; Retterer Dep. at 14-18.) Plaintiff contends when there was a problem with a fax transmission, he provided his mother's address in St. Louis to which the paperwork should be sent. (Lincoln Dep. at 143-45.) Plaintiff did not receive the paperwork and discovery revealed that the address found on the letter accompanying the paperwork was to Plaintiff's former residence in St. Louis. (Pl.'s Submission in Supp. Mot. to Amend for Punitive Dams., Ex.5.) Concerned about the non-receipt of the FMLA paperwork, Plaintiff testified that he contacted Graham. (Lincoln Dep. at 147.) Plaintiff asserts that Graham assured him not to worry about the FMLA paperwork. (Id. at 160-61.) Several weeks later, Plaintiff was terminated and received a termination letter dated July 26, 2000. (Pl.'s Submission in Supp. Mot. to Amend for Punitive Dams., Ex. 8.) The termination letter states that the specific reason for termination was for Plaintiff's failure to return the FMLA paperwork within 15 days and for Plaintiff's alleged lack of contact with anyone in the Brooklyn Park, Minnesota office. (Id.)

As Plaintiff contends, he did not receive the paperwork and so informed his manager, Graham. In support of his motion to amend, Plaintiff has provided the FMLA paperwork and accompanying cover letter addressed to his former residence in St. Louis. (Pl.'s Submission in Supp. Mot. to Amend for Punitive Dams., Exs. 5 & 6.) The FMLA paperwork provided Plaintiff with 25 days for completion. (Pl.'s Submission in Supp. Mot. to Amend for Punitive Dams., Ex. 6.) In deposition testimony, Defendant's Regional Director of Human Services Charles Klinzing indicated that the "25 days" would have been 25 "business days." (Klinzing Dep. at 157-58.) Even as of the date of the July 26, 2000 termination letter, Plaintiff still would have fallen within the 25-day period in which to return the FMLA paperwork. Graham's assurances to Plaintiff misrepresented information on which Plaintiff relied to his detriment. Plaintiff was

ultimately terminated for failure to timely complete paperwork and for lack of contact with his office during his leave, despite his non-receipt of that paperwork, despite Graham's knowledge of that non-receipt, and despite the fact that when the paperwork was ultimately produced in discovery, it revealed that Plaintiff still fell within the time-frame to complete the paperwork even on the date of his termination. Further, Plaintiff has not only testified that he spoke with Graham during his leave, but that he visited the office during his leave at which time he handled some work-related matters and spoke with several work colleagues (Lincoln Dep. at 150-55; 161-62.)

As a manager and an employee who had himself taken an FMLA leave when his own father underwent surgery, Graham was aware of the FMLA. Through conversations with Human Resources's Retterer and alleged conversations with Plaintiff, Graham knew that Plaintiff's June-July 2000 leave was intended to be taken under the FMLA. During that leave, Graham informed Vice President of Operations Larry Hoerner that he was unaware of Plaintiff's whereabouts. Graham further told Defendant's employee Chantal Devane that Plaintiff was not returning to work. Furthermore, taking Plaintiff's allegations as true, Graham assured Plaintiff that the non-receipt of the FMLA paperwork did not constitute a problem. Graham later participated in a telephone conversation with both Plaintiff and Regional Director of Human Services Charles Klinzing during which Plaintiff was fired for not returning the FMLA paperwork and for making no attempt to contact anyone in the office since he left in June. At a minimum, Graham was aware of Plaintiff's whereabouts during his leave and, based on Plaintiff's allegations, had informed Plaintiff that the lack of FMLA paperwork was not a problem.

Based upon this and other evidence in the record, this Court finds that clear and

convincing evidence exists such that a jury could find Defendant deliberately disregarded Plaintiff's rights.

### C. Plaintiff's Motion for Leave to File Third Amended Complaint and for Discovery Related to Punitive Damages

Plaintiff requests leave to serve and file a Third Amended Complaint which includes the addition of punitive damages claims. As the Court grants the amendment of punitive damages claims, service and filing of the Third Amended Complaint is therefore granted .

Plaintiff requests a period of sixty days in which to conduct discovery pertaining to punitive damages. Mindful of upcoming deadlines in the scheduling order, this Court grants a more limited period of time – thirty days – in which plaintiff may conduct written or other discovery relating to punitive damages.

**THEREFORE, IT IS HEREBY ORDERED that:**

1. Plaintiff's Motion to Amend Complaint to Seek Punitive Damages (Doc. No. 33) is **GRANTED** and Plaintiff may serve and file its Third Amended Complaint with the punitive damages amendment.

2. Plaintiff's Motion to Engage in Reasonable Discovery Related to the Issue of Punitive Damages (Doc. No. 33) is **GRANTED for a period of thirty days**.

Dated: September 2, 2003

Susan Richard Nelson

SUSAN RICHARD NELSON
United States Magistrate Judge