UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Robert T. Lincoln,

Plaintiff,

v.

Sears Home Improvement Products, Inc.,

Defendant.

Civil No. 02-840 (DWF/SRN)

**MEMORANDUM OPINION AND ORDER**

---

James Gallagher Ryan, Esq., Ryan Law Office, 80 S. 8th St., Ste. 820, Minneapolis, MN 55402, counsel for Plaintiff.

Jeffrey George Vigil, Esq., Kathryn A. Mrkonich, Esq., and Heather C. Fokken, Esq., Littler Mendelson, 33 6th St. S., Ste. 3110, Minneapolis, MN 55402, counsel for Defendant.

---

## Introduction

The above-entitled matter came on for hearing before the undersigned United States District Judge pursuant to Plaintiff's Motion for Partial Summary Judgment and the Defendant's Motion for Summary Judgment. For the following reasons, Plaintiff's motion is denied; Defendant's motion is denied in part and granted in part.

## Background

Sears Home Improvement Products ("SHIP") sells and installs vinyl siding, replacement windows, and cabinets. In July 1999, Plaintiff Robert T. Lincoln ("Lincoln") was promoted and transferred to SHIP's office in Brooklyn Park, Minnesota, from the SHIP office where he previously worked in St. Louis, Missouri. Lincoln alleges that at the time of his transfer from

FILED JAN 0 9 2004
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

St. Louis to Brooklyn Park, Chuck Klinzing, SHIP's Regional Director of Human Resources, and Larry Hoerner, Regional Director of Installations, assured Lincoln that if he accepted the promotion and transfer, he still would be allowed to take leave to attend to his ailing parents in St. Louis. Lincoln's claims arise from a number of alleged failures by SHIP to grant Lincoln leave to assist his parents after he had transferred to Minnesota.

**1. Lincoln's Father's Illness**

Lincoln first requested leave in March 2000 when his father underwent quadruple bypass surgery and had a cancerous portion of one of his lungs removed at a hospital in St. Louis. There is some dispute as to when Lincoln became aware of his father's scheduled surgery. SHIP asserts that Lincoln knew about the surgery as much as 10 days before the surgery occurred on March 23, 2000. Lincoln, on the other hand, asserts that although he knew about his father's health condition earlier in March 2000, he was only notified of the surgery itself approximately 24 to 48 hours prior to the surgery. (*See* Deposition of Robert T. Lincoln ("Lincoln Dep.") at 33.) This testimony is consistent with Lincoln's mother's affidavit dated September 20, 2003, that stated she first learned of the actual date of the surgery no earlier than March 20, 2000. (*See* Affidavit of Delores Lincoln at ¶ 8.)

Lincoln undisputedly notified Tim Graham, his immediate supervisor in Chicago, of the surgery approximately 24 to 48 hours prior to the scheduled surgery. Lincoln asserts that Graham refused Lincoln's request to attend to his father. Further, Lincoln contends that Graham told him that everyone was "too busy," and that Lincoln should just "suck it up" and "[i]t's just surgery." (*See* Lincoln Dep. at 75.) Undisputedly, Graham never mentioned FMLA leave. (*Id.*)

However, Graham asserts that he urged Lincoln to go to see his father and that he even offered to fly Graham to St. Louis at the company's expense. Lincoln did not attend his father's surgery.

Soon after the bypass and lung surgery, Lincoln's father went into a coma and was not expected to live. Lincoln again requested leave and Graham did not mention FMLA leave to Lincoln. Lincoln contends that Graham initially refused this request, told Lincoln that he was just wasting his time, and told Lincoln that he should "save the trip for the funeral." (*See* Lincoln Dep. at 86.) Graham does not recall that Lincoln requested leave at this time and denies making these statements. Regardless, Graham ultimately allowed Lincoln five work days of paid leave, and Lincoln went to St. Louis on March 27, 2000. Lincoln claims that he was required to run the Brooklyn Park office from St. Louis while he visited his comatose father. However, Graham insists that Lincoln voluntarily worked while he was away. Toward the end of his time in St. Louis, Lincoln requested additional leave from Graham. Lincoln asserts that Graham refused his request, so Lincoln returned to work. Graham denies having forced Lincoln to return early.

Later that spring, Lincoln requested leave when his father regained consciousness. Lincoln asserts that Graham denied his request. Graham, however, asserts that he urged Lincoln to see his father, and that he again offered to fly Lincoln to St. Louis at company expense. Again, it is undisputed that Graham did not mention FMLA leave to Lincoln. Lincoln did not visit his father.

Lincoln's father died on May 30, 2000. Lincoln took eight days of paid leave to attend the funeral. Although Lincoln contends that he completed all of the work expected of him during his absence, Graham asserts that he covered Lincoln's duties during Lincoln's absence and determined that Lincoln was having some performance issues with his job.

**2. Lincoln's Mother's Illness**

In June 2000, Lincoln contacted SHIP's Human Resources Department to see if he could take leave to return to St. Louis to assist his mother. Apparently, Lincoln's mother had become depressed and suicidal in the wake of her husband's death. Lincoln apparently only notified SHIP that his mother was suffering from depression, although she in fact suffered from congestive heart failure, hypertension, and heart palpitations as well.

It was only at the time of this request that the Human Resources Department informed Lincoln that he may be eligible for FMLA leave. Lincoln asserts that the Human Resources Department confirmed that he was eligible for FMLA leave and arranged to have the proper FMLA paperwork sent to him.[1] Lincoln then informed Graham that he would be taking FMLA leave to assist his mother in St. Louis. Lincoln asserts that Graham became angry and attempted to dissuade him from taking the leave, but eventually acquiesced.

Lincoln asserts that the paperwork initially faxed to him from Human Resources had "American Home Improvement Products" or "AHIP" (the predecessor company to SHIP) printed at the top of the pages. Lincoln contends that he contacted Human Resources immediately to determine whether he should still sign the forms despite the alleged incorrect headings. Lincoln alleges that the facsimile transmission was stopped and he was told to wait for new FMLA forms to be mailed to him. SHIP denies that this version of events could have occurred, although SHIP has no concrete testimony to support its contentions, other than statements from the person who "likely" would have spoken to Lincoln at that time. Lincoln asserts that he provided the Human

---

[1] Patti Retterer, the Human Resources employee to whom Lincoln spoke, testified that she told Lincoln that she "thought" he qualified for FMLA leave.

Resources Department with his mother's mailing address in St. Louis where the paperwork should be sent. Retterer testified that Lincoln spoke with her about the FMLA paperwork at some point and that, together, they calculated the dates by which the paperwork needed to be returned.

Upon Lincoln's arrival in St. Louis, Lincoln's mother refused to seek medical help for her depression. Lincoln still had not received the FMLA paperwork. Lincoln asserts that he made a number of attempts to contact Human Resources in order to set the matter straight, but was never able to contact anyone. Lincoln asserts that he then contacted Graham and told Graham that he had not received the paperwork. Lincoln contends Graham told him not to worry about it. (*See* Lincoln Dep. at 160-61.) Graham denies this assertion and contends that if Lincoln had indeed asked for this information, Graham would have "made sure that he got what he needed." (Graham Dep. at 213.)

Lincoln was scheduled to return to work on July 17, 2000. Lincoln alleges that he contacted Graham to coordinate his return near the end of the two-week leave, and, at that time, Graham insisted that Lincoln delay his return until the beginning of August. Graham denies forcing Lincoln to take more leave and does not recall any discussions with Graham in July 2000 until Lincoln's subsequent termination. Lincoln asserts that he had still not received the FMLA paperwork from SHIP at this time. Lincoln did not receive the FMLA paperwork because it had been sent to Lincoln's former St. Louis address rather than to his mother's address, as he had requested. (*See* Lincoln Dep. at Ex. 5.)

On July 31, 2000, Lincoln received a letter dated July 26, 2000, from the Regional Director of Human Resources, Charles W. Klinzing, terminating Lincoln's employment on the

grounds that Lincoln had abandoned his job. The letter stated as follows:

> Pursuant to your request of June 27, 2000 we forwarded to your attention via facsimile to the Brooklyn Park, MN office the necessary paperwork for you to complete in order to activate your FMLA leave. These documents were received by you on or about June 29, 2000.
>
> In order for the FMLA leave to be triggered you are required to return such paperwork within 15 days of receipt thereof. Excluding the 4th of July, this paperwork was due back to the company by July 21, 2000.
>
> In as much as neither the Human Resources Department, the Brooklyn Park office, nor your immediate supervisor, Mr. Tim Graham has heard anything from you in the intervening three and one half weeks, we are left with no alternative but to conclude that you have elected to terminate your employment. Accordingly, the company considers your employment to be terminated voluntarily as of June 29, 2000.

Lincoln contends that he never received the FMLA paperwork that was required to be filled out in order to activate his FMLA leave, that he was not offered FMLA leave according to the law and to SHIP policy, and that he was treated differently from other employees at SHIP. In support of these arguments, Lincoln points to the fact that his FMLA paperwork was sent to the wrong address, the paperwork was not sent by certified mail, and Lincoln was not given 25 work days to complete the medical certification form. Finally, Lincoln asserts that he was treated differently from SHIP policy and custom as to his FMLA leave. Lincoln points to a memo written by Human Resources employee Tina Lowman regarding another SHIP employee who had been sent FMLA paperwork that stated, in part, as follows:

> Past practice has been that if we have not received the medical documentation by the date given, we've sent the associates a letter stating that since we have not received the documentation, you must either return to work by a specific date or we would accept that as their voluntary resignation so I'm assuming we would need to do the same for [this employee].

(See Affidavit of Patricia M. Cayo at ¶ 7, Ex. G.)

Moreover, Lincoln asserts that prior to the time that he was required to return his FMLA paperwork, Graham was already predisposed to terminating Lincoln's employment. Lincoln points to an affidavit from Chantal Devane, a sales representative who worked with Lincoln in the Minnesota office, who inquired as to Lincoln's whereabouts on July 7, 2000, and was told by Graham that, "Rob's not coming back. Rob's not going to work here anymore." (*See* Affidavit of Chantal Devane at ¶ 15.) Graham denies this assertion. Lincoln also points to a fax sent from Graham to Klinzing dated July 14, 2000, regarding what Graham contended were service problems related to Lincoln's employment, stating that Graham was "still digging" for information on Lincoln. (Deposition of Timothy P. Graham at 197-202, Exs. 29 and 31.) SHIP asserts, however, that Lincoln was terminated solely because he failed to return the FMLA paperwork.

In his Second Amended Complaint, Lincoln alleges the following: (1) violations of the Family Medical Leave Act, 29 U.S.C. § § 2601, *et seq.* ("FMLA"); and (2) common law claims for intentional infliction of emotional distress, fraud, misrepresentation, and promissory estoppel.[2] In his Motion for Partial Summary Judgment, Lincoln asserts that he is entitled to summary judgment on certain aspects of the FMLA claim.

SHIP, on the other hand, moves for summary judgment on all of Lincoln's claims. First, SHIP contends that Lincoln has failed to demonstrate that he was entitled to leave under the FMLA. Second, SHIP asserts that Lincoln's common law claims are preempted by the

---

[2] Lincoln's Second Amended Complaint also included a claim for negligent infliction of emotional distress, but pursuant to Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment at page 8, note 21, Lincoln voluntarily dismissed this claim.

Minnesota Workers' Compensation Act. Finally, SHIP asserts that Lincoln has failed to state claims for intentional infliction of emotional distress, fraud, misrepresentation, or promissory estoppel.

## Discussion

### 1. Standard of Review

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enter. Bank v. Magna Bank of Missouri*, 92 F.3d 743, 747 (8th Cir. 1996). However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enter. Bank*, 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record which create a genuine issue for trial. *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Krenik*, 47 F.3d at 957.

**2. The FMLA**

The FMLA allows eligible employees to take up to 12 workweeks per year of medical leave to care for a parent with a serious health condition, and protects their right, upon return, to be placed in the same or an equivalent position. *See* 29 U.S.C.A. §§ 2612(a)(1)(C), and 2614(a). An employer violates the FMLA if it denies the employee leave or reinstatement following the leave. 29 U.S.C.A. §§ 2612(a), 2614(a), and 2615(a)(1); *Martyszenko v. Safeway, Inc.*, 120 F.3d 120, 122 (8th Cir. 1997).

Under the FMLA, the employer's duties are triggered when the employee provides enough information to put the employer on notice that the employee may be in need of FMLA leave; the employee need not specifically mention the FMLA. *See Browning v. Liberty Mutual Ins. Co.*, 178 F.3d 1043, 1049 (8th Cir. 1999). However, FMLA regulations require employees to provide adequate notice to their employers of the need to take leave. *See* 29 C.F.R. § 825.302-303. *Carter v. Ford Motor Co.*, 121 F.3d 1146, 1148 (8th Cir. 1997). In situations where the need for leave unexpectedly arises, the employee is to give notice "as soon as practicable." 29 C.F.R. § 825.303(a); *Carter*, 121 F.3d at 1148.

Lincoln's FMLA claims relate to the incidents with Lincoln's father's illness and the incident with his mother's illness. Lincoln asserts that SHIP denied him his rights under the FMLA by failing to inform him of his FMLA rights during his father's illness and by refusing to grant him the leave that he was entitled to during his father's illness and while he was caring for his mother.

SHIP asserts that Lincoln did not provide SHIP with timely or sufficient notice of his need to take FMLA leave. SHIP also contends that Lincoln's mother did not suffer from a

"serious health condition" necessitating Lincoln's leave. Finally, SHIP asserts that it did not retaliate against Lincoln because Lincoln attempted to exercise his FMLA rights. SHIP moves for summary judgment on these grounds.

First, the Court finds that Lincoln did provide SHIP with timely notice of his need to take FMLA leave. Although Lincoln knew that his father suffered from a serious health condition and that he was undergoing treatment and evaluations for a variety of conditions, the record fully supports Lincoln's contention that he was not apprised of the actual date that his father would undergo lung cancer and heart-bypass surgery until, at earliest, approximately one to three days before the surgery took place. (*See* Affidavit of Delores Lincoln at ¶ 8.) The record demonstrates that Lincoln told Graham of the surgery as soon as he learned of the surgery date and within 24 to 48 hours prior to the surgery. (*See* Lincoln Dep. at ¶ 33.) Thus, the Court finds that Lincoln gave SHIP notice of the surgery "as soon as practicable" and in compliance with the FMLA. *See* 29 C.F.R. §§ 825.303(a). SHIP's motion for summary judgment is denied on this issue.

Second, the Court finds that contrary to SHIP's assertions, Lincoln provided a sufficient reason to trigger his right to FMLA leave. Although Graham testified that Lincoln's details about his father's condition were "sketchy" and "convoluted" (*see* Graham Dep. at 130-34), it appears that Graham's memory of his conversation with Lincoln is rather incomplete as well. Graham does not remember many of the details of his conversations with Lincoln, yet SHIP asserts that Lincoln did not give notice of his request for a leave. (*Id.* at 134.) Lincoln, on the other hand, asserts that he told Graham about the nature of the surgery and that he felt that he should be there. (*See* Lincoln Dep. at 75.) SHIP does not dispute that Lincoln told Graham this

information, and it appears that Graham just does not recall exactly what was said. Thus, summary judgment is inappropriate on this issue.

Third, the Court finds that Lincoln provided adequate notice of the timing of his leave. Undisputedly, Lincoln told Graham of his need for leave just prior to leaving for the surgery. Lincoln, who asserts he was not informed of the FMLA at the time of his request, may have had no way of knowing of either the need to specify the duration of his leave, or, due to the nature of his father's condition, what that duration would be. As such, SHIP's request for summary judgment on this issue is denied.

The next matter to be addressed in SHIP's Motion for Summary Judgment is whether Lincoln's mother's illness qualified as a "serious health condition" that entitled Lincoln to FMLA leave. Primarily, SHIP asserts that because no health care provider diagnosed Lincoln's mother's asserted depression condition or had her under continuing treatment for that condition, Lincoln did not qualify for FMLA leave to care for her. In addition, SHIP asserts that Lincoln did not provide adequate notice for the leave he took to visit his mother. Finally, SHIP asserts that it did not retaliate against Lincoln for exercising his FMLA leave for his mother's illness.

Undisputedly, Lincoln's mother was not in perfect health. She had been undergoing treatment for congestive heart failure for more than 30 years. However, when Lincoln notified Graham of his need to care for his mother, it appears that Lincoln cited his mother's depression as the reason that his presence was required in St. Louis to care for her. Although Lincoln's mother refused to get out of bed, was not taking care of herself, and was writing suicide notes, she refused to seek medical help. SHIP asserts that because her depression was self-diagnosed and untreated, Lincoln is not entitled to leave.

The Court finds that fact questions exist as to whether Lincoln received the paperwork required to fulfill his FMLA leave requirements, thus precluding summary judgment on this issue. A jury could find that Lincoln was correct in asserting that he did not receive any paperwork and that he was given assurances to wait for the new paperwork to arrive in St. Louis. If this is the case, the jury could find that Lincoln was not put on notice of the need for medical certification of his mother's illness, an illness that apparently was serious but, at that time, undiagnosed. As such, summary judgment is denied on this issue.

Finally, SHIP asserts that it did not retaliate against Lincoln for attempting to exercise his FMLA rights. In order to establish a prima facie case of FMLA retaliation, an employee must demonstrate that he engaged in an activity protected under the Act, that he suffered an adverse employment action by the employer, and that a causal connection exists between the employee's action and the employer's adverse action. *See Darby v. Bratch*, 287 F.3d 673, 679 (8th Cir. 2002). SHIP contends that Lincoln was terminated for his failure to return the FMLA paperwork in a timely fashion. Lincoln asserts that he never received the paperwork as SHIP promised, and that he was assured by Graham that he need not worry about having not received the paperwork. Because fact questions exist as to whether Lincoln received the FMLA paperwork, and thus as to whether Lincoln even knew of the requirements of submitting the paperwork, summary judgment on this issue is inappropriate.

Having denied SHIP's Motion for Summary Judgment as to the FMLA claims, the Court turns to Lincoln's Motion for Partial Summary Judgment. Lincoln moves for partial summary judgment, asserting that SHIP violated the FMLA by: (1) failing to offer Lincoln FMLA leave on the occasions of his father's surgery, upon his father's lapse into a coma, and upon his father's

emergence from the coma; (2) failing to notify Lincoln that his failure to return the medical certification would result in his termination; (3) terminating Lincoln for failing to provide the certification long before the calculated due date of that paperwork; (4) terminating Lincoln without first notifying him that the paperwork had not been received; and (5) forcing Lincoln to take a month-long leave instead of the two weeks that Lincoln requested.

First, without citing any case law or explicit statutory support for the proposition, Lincoln asserts that SHIP's failure to mention FMLA leave on the three occasions when Lincoln requested time to see his father is a violation of the FMLA. While the Court agrees that, undisputedly, Graham did not mention FMLA leave to Lincoln on these three occasions, the Court finds that genuine fact issues exist as to whether Lincoln was offered leave at all, or whether SHIP denied or interfered with Lincoln's requests for leave. Because such fact issues exist, the Court does not necessarily find it fatal that SHIP failed to mention the magic words of FMLA leave. Viewing the facts in the light most favorable to SHIP, the non-moving party, the Court finds that a jury could believe Graham's testimony that he knew that he was obligated to grant Lincoln leave if he asked for it, that he did not refuse Lincoln's requests for leave, and that he repeatedly offered to fly Lincoln to see his father upon Lincoln's request for leave. Thus, Graham and SHIP may have complied with the FMLA without mentioning the FMLA itself. As such, summary judgment is inappropriate on Lincoln's asserted FMLA violations.

Because genuine issues of fact remain as to Lincoln's other asserted FMLA violations, summary judgment would be inappropriate on these claims. As such, Lincoln's motion for partial summary judgment is denied in its entirety.

**3. MWCA Preemption**

SHIP argues that Lincoln's common law claims are preempted by Minnesota's Workers' Compensation Act, Minn. Stat. § 176.001, *et seq*. The Court has already addressed this matter. Consistent with the Court's determination in its Order dated September 30, 2003, and consistent with Magistrate Judge Susan Richard Nelson's Order dated September 2, 2003, the Court finds that Lincoln's common law claims are not preempted by the Workers' Compensation Act.

**4. Lincoln's Common Law Claims**

**A. Intentional Infliction of Emotional Distress**

In order to establish a claim for intentional infliction of emotional distress, Lincoln must demonstrate: (1) the conduct was extreme and outrageous; (2) the conduct must be intentional or reckless; (3) the conduct must cause emotional distress; and (4) the distress must be severe. *See Hubbard v. United Press Int'l, Inc.*, 330 N.W.2d 428, 438-39 (Minn. 1983). "The operation of this tort is sharply limited to cases involving particularly egregious facts." *Id.* at 439. SHIP moves for summary judgment on Lincoln's claim for intentional infliction of emotional distress, contending that Lincoln cannot establish the *prima facie* elements of his claim. The Court agrees.

In order to qualify as "extreme and outrageous," conduct "must be 'so atrocious that it passes the boundaries of decency and is utterly intolerable to the civilized community.'" *Id.* (quoting *Haagenson v. Nat'l Farmers Union Property & Cas. Co.*, 277 N.W.2d 648, 652 n.3 (Minn. 1979)). The plaintiff must suffer from distress "so severe that no reasonable man can be expected to endure it." *Hubbard*, 330 N.W.2d at 439. Lincoln asserts that he was depressed, embarrassed, guilty, lost his job, and suffered economic harm as a result of SHIP's actions.

Lincoln never sought treatment for any of the psychological harm that he alleges. Even assuming that all of Lincoln's assertions are true and although the Court is sympathetic to the serious nature of Lincoln's distress, the Court finds that SHIP's actions fall below the high standard of severe distress required to sustain a claim for intentional infliction of emotional distress. Because Lincoln has not met the threshold required to establish a claim of intentional infliction of emotional distress, SHIP's motion for summary judgment is granted as to Count Three of the Second Amended Complaint.

**B. Fraud/Misrepresentation**

Lincoln's claims of intentional and negligent misrepresentation are based upon two separate "statements" made by SHIP employees. First, Lincoln asserts that when negotiations were underway prior to his promotion and transfer in July 1999, SHIP misrepresented that Lincoln would be able to take time off to attend to his parents in St. Louis. Second, Lincoln asserts that in July 2000, SHIP misrepresented, through Graham, that Lincoln need not be concerned that he had not received the FMLA paperwork.

In order to prove fraud or misrepresentation, Lincoln must establish that SHIP employees (1) made a representation (2) that was false (3) having to do with a past or present fact (4) that is material (5) and susceptible of knowledge (6) that the representor knows to be false or is asserted without knowing whether the fact is true or false (7) with the intent to induce the other person to act (8) and the person in fact is induced to act (9) in reliance on the representation (10) that the plaintiff suffered damages (11) attributable to the misrepresentation. *See M.H. v. Caritas Family Services*, 488 N.W.2d 282, 289 (Minn. 1992).

The Court finds that with regard to both of Lincoln's misrepresentation claims, genuine issues of fact exist as to what actually occurred and what "promises" were made at the time of the alleged misrepresentations. As to the July 1999 statements, Lincoln asserts that Hoerner and Klinzing assured him that there would be no problem with him returning to St. Louis to care for his parents should the need arise. SHIP denies that any such promise was made. As to the July 2000 statements, Lincoln asserts that when he inquired as to the FMLA paperwork being sent, Graham told Lincoln not to worry about it and that it would be handled. Graham denies these assertions. These factual disputes directly involve whether representations were made regarding SHIP policy that Lincoln may have been induced to rely upon. Thus, summary judgment is inappropriate on Lincoln's misrepresentation claim.

**C. Promissory Estoppel**

Similarly, SHIP moves for summary judgment on Lincoln's claim of promissory estoppel. Lincoln's promissory estoppel claim is based on the same asserted two "promises" as are his misrepresentation claims. "Promissory estoppel is an equitable doctrine that 'implies a contract in law where none exists in fact.'" *Martens v. Minnesota Mining & Mfg. Co.*, 616 N.W.2d 732, 746 (Minn. 2000) (quoting *Grouse v. Group Health Plan, Inc.*, 306 N.W.2d 114, 116 (Minn. 1981)). The elements of a promissory estoppel claim are: (1) that a clear and definite promise was made; (2) the promisor intended to induce the promisee to rely on the promise and the promisee did in fact rely to his or her detriment; and (3) the promise must be enforced to prevent injustice. *See id.* (citing *Cohen v. Cowles Media Co.*, 479 N.W.2d 387, 391 (Minn. 1992)). In order to survive SHIP's motion for summary judgment, Lincoln must direct the Court to some evidence that would support each element.

As to the first factor, a genuine issue of fact exists as to whether either promise was actually made by SHIP employees to Lincoln. Viewing the facts in the light most favorable to Lincoln, a jury could find that the statements allegedly made by SHIP employees in July 1999 and July 2000, if indeed true, are sufficient to constitute a clear promise.

Second, assuming that a reasonable jury found a clear and definite promise, it could also conclude that SHIP could have reasonably expected that Lincoln would rely on that promise to his detriment. Lincoln asserts that he took the job in Brooklyn Park based on SHIP's assertions that he could attend to his parents in St. Louis without any problem. In addition, Lincoln asserts that he relied upon Graham's representations that he need not worry about the FMLA paperwork. Lincoln asserts that he suffered a detriment because he moved away from his parents, did not see his father conscious from the time of his surgery to his death, and ultimately lost his job in reliance upon these promises. Although fact questions exist as to these assertions, viewing the facts in the light most favorable to Lincoln, a jury could find that Lincoln acted in reliance upon these representations.

Finally, the Court finds that if a jury concluded that the previous elements were established, the Court would enforce the SHIP employees' promises to prevent injustice. As such, SHIP's motion for summary judgment is denied on this issue.

Accordingly, **IT IS HEREBY ORDERED** THAT:

1. Defendant's Motion for Summary Judgment (Doc. No. 59) is **GRANTED IN PART** and **DENIED IN PART**, as follows:

    a. Defendant's Motion for Summary Judgment is **DENIED** as to Count I of the Second Amended Complaint (the FMLA claims);

b. Defendant's Motion for Summary Judgment is **DENIED** as to Defendant's claims of preemption based upon the Minnesota Workers' Compensation Act;

c. Defendant's Motion for Summary Judgment is **DENIED** on Counts Five, Six, and Seven of the Second Amended Complaint; and

d. Defendant's Motion for Summary Judgment is **GRANTED** on Count Three of the Second Amended Complaint.

2. Plaintiff's Motion for Partial Summary Judgment (Doc. No. 66) is **DENIED**.

3. Pursuant to the voluntary dismissal noted in Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment at page 8, note 21, Plaintiff's claim for negligent infliction of emotional distress (Count Two of the Second Amended Complaint) is **DISMISSED WITH PREJUDICE**.

Dated: January 9, 2004

DONOVAN W. FRANK
Judge of United States District Court